UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at Chattanooga

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | 1:05-cr-8 |
| | ) | Collier/Carter |
| DEXTER LAMAR YOUNG | ) | |
| ALANDYS COUNCIL | ) | |

REPORT AND RECOMMENDATION

## I. Introduction

Defendants Dexter Lamar Young's and Alandys Council's respective motions to suppress (Court File Nos. 20, 22, 30, 38) are pending before the undersigned having been referred for a report and recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B). The primary issues before the undersigned concern the validity of a traffic stop and whether individuals held in the back of a patrol car have a reasonable expectation of privacy such that a surreptitious recording of their conversations violates the defendants' constitutional rights and Title III of the Omnibus Crime Control and Safe Streets Act of 1986, 18 U.S.C. § 2510 *et seq.* I conclude the traffic stop was valid and the defendants did not have a reasonable expectation of privacy in the back of the patrol car and therefore RECOMMEND defendants' respective motions be DENIED.

## II. Relevant Facts

Officer Robert Lewis and Officer James Hixson of the Chattanooga Police Department (CPD) were the only witnesses to testify at an evidentiary hearing held on the defendants' motions to suppress before the undersigned on Monday, April 11, 2005.

*Officer Robert Lewis*

Officer Lewis testified to the following: He has been employed by the CPD for eleven years. On January 20, 2005, the date at issue, he was assigned to a five man special investigative unit working crime interdiction on the interstate within the city limits of Chattanooga, Tennessee. On January 20, 2005, at approximately 3:40 p.m., Officer Lewis observed a maroon Buick LeSabre northbound in the fast lane of 10000 I-75 while stationary in his marked patrol car. The suspect vehicle appeared to have window tinting that was beyond the legal limit in Tennessee. He pulled out to follow the vehicle, and as he pulled nearer to the defendants' car, he saw the car had Georgia tags. Officer Lewis also noticed a brake light was out and the lock was punched on the trunk.[1] Officer Lewis was aware that the Tennessee statute regarding window tinting applies only to vehicles registered in Tennessee, and, thus, he could not make a stop for that reason. However, upon approaching the vehicle from the rear, Officer Lewis saw the vehicle weave back and forth across the center line, then cut abruptly into the right lane without signaling, and hit the brakes almost causing a white pickup to collide with it. Officer Lewis then stopped the vehicle at 14000 I-75. The police car's video recorder turned on automatically when Officer Lewis activated his blue lights. Upon contact with the driver, defendant Council, through the passenger window, the driver could not produce a license. Both occupants had glassy eyes and appeared to be under the influence of some type of intoxicant. The driver immediately began crying "without tears," talking of his grandmother's bad health. The driver inquired as to why he had been stopped. Lewis began to explain that he had first

---

[1] Neither of these factors is an offense for which a vehicle may be stopped under Tennessee law. The brake light that was malfunctioning was the third brake light in the middle of the back window, and Tennessee law requires only two working lights on the outside of the car.

noticed the window tint looked too dark for Tennessee, but the driver cut him off before he could complete his explanation. Lewis testified that he did not pull over the defendants for the window tint because the Tennessee law prohibiting dark window tint does not apply to vehicles registered outside of Tennessee; rather, he stopped the defendants for weaving and cutting off the other driver abruptly in the left lane. The driver was asked to step from the vehicle, and, upon doing so, he immediately stopped crying. The driver could produce no identification. Moments later he produced a Ga. ID only card after advising Lewis his driver's license was suspended for child support. At this time, Lewis asked the driver if he had any weapons and if he would consent to a pat down search. Council gave consent to the pat down which revealed nothing. Lewis told Council to wait at the front of his patrol car and he went to speak with the passenger, Young, who was still in the vehicle. Upon speaking with Young, Lewis smelled the odor of alcohol. Lewis asked Young for identification, but Young had none. Lewis asked Young to step from the car and for permission to conduct a pat down. Young consented to a pat down. Prior to being searched, Young advised he had a lighter in his pocket that looked like a pistol. The lighter was retrieved, and a search produced nothing else. Lewis asked Council if he could search the vehicle, and Council assented and told Lewis there were "roaches," marijuana cigarette butts, in the ashtray. Lewis then confirmed his consent, and the driver asked Lewis to "please" search the car. This exchange is clearly recorded both visually and auditorily on the videotape and supports Lewis' testimony.

      A search of the car found no roaches in the ashtray; however, several roaches were found in a wrapper in the driver's door handle. As the wind blew through the open doors and windows of the vehicle, Lewis detected an odor of raw marijuana inside the car. Lewis found a partial

cookie of crack and a 9 mm pistol under the back seat. At this point Lewis placed the defendants under arrest. Sgt. Gregg Bowman had arrived while Lewis was searching the car, and Bowman secured the defendants outside the vehicle while Lewis searched the vehicle. Several bottles of "Blunt Power," a strong air freshener, were found inside the vehicle. Another 1 oz. bag of marijuana was recovered further up under the seat, a set of digital scales and a CD case with marijuana residue were found in the pocket behind the driver's seat, and $68.00 was recovered in the center console along with $200.00 on Council's person.

Prior to placing the defendants inside the patrol car after their arrest on January 20, 2005, Officer Lewis placed a fresh audiotape in the tape recorder installed in his patrol car and turned the machine on. He then placed the defendants in the back of the patrol car where their conversations were recorded without their knowledge. While they were waiting in the back of the police car, they made several incriminating statements which were recorded. Later, at the police station, after the defendants received Miranda warnings and waived their Fifth Amendment rights, Officer Lewis began his interview of the defendants by telling them he knew about their statements in the patrol car as he had listened to the tape. The defendants subsequently made more incriminating statements during the interview.

That same day, on January 20, 2005, Officer Lewis prepared a report (Gov. Ex. 5) at the request of Officer James Hixson, the liaison officer for the CPD with the federal Drug Enforcement Administration (DEA). Officer Hixson intended to present this information to the United States Attorney's Office for federal prosecution and the federal Grand Jury was meeting very soon. Lewis testified this was a preliminary report, and, over the next several days, he added more information to the report. (*See* Gov. Ex. 2). These reports are not the official

4

investigative reports maintained by the CPD as part of the public record; rather, they are reports kept in Officer Lewis' own investigative files.  Also on January 20, 2005, after Lewis interviewed the defendants, he prepared for each defendant a "Uniform Arrest Report - Affidavit of Complaint" (Gov. Exs. 3 and 4).   Lewis' investigative reports and the arrest reports each state Lewis observed the defendants' vehicle weave before Lewis made the traffic stop. Council's arrest report and the two investigative reports also provide that defendants' vehicle pulled into the right lane and "hit the brakes" almost causing an accident with the vehicle in the rear.  As to the investigative report Lewis completed over the course of several days, four lines were added, only one of which has bearing on the issues presented by defendants' motions: "The driver confirmed the knowledge of the traffic violations stating that he was swerving while trying to watch the police car in his blind spot."  (Gov. Ex. 2).  The CPD has attempted to find the official incident report for the January 20, 2005 traffic stop and subsequent arrest but has been unable to do so.  Officer Lewis testified the CPD computer system which stores such reports has had some failures recently and some official incident reports have been lost.

*Officer James Hixson*

Officer Hixson testified to the following: He has been employed with the CPD for ten years and is currently assigned as a liaison officer with the federal Drug Enforcement Administration (DEA), as he was on January 20, 2005.  Officer Lewis contacted him on January 20, 2005, or the day after, to inform him of the defendants' arrests.  Lewis told Hixson he had stopped the defendants' vehicle for weaving.  Hixson told Lewis to prepare something in writing for him quickly because the federal Grand Jury would be meeting soon.  Hixson then called the United States Attorney's Office, he believed on Friday, January 21, 2005,  to present this

Case 1:05-cr-00008-CLC-WBC   Document 45   Filed 05/16/05   Page 5 of 13   PageID #: 5

information for possible federal prosecution. Lewis did provide the report requested telling Hixson that it was a short statement and that he had more information which he would give later. Hixson could not remember if he gave the report to Assistant United States Attorney (AUSA) Steve Neff or if Lewis himself gave the report directly to AUSA Steve Neff.

### III. Discussion

*A. The Traffic Stop*

Defendants argue the true reason Officer Lewis stopped defendants' vehicle was because of the tinted windows, a reason which would not justify the stop since the Tennessee law concerning tinted windows applies only to vehicles registered in Tennessee and the Buick LeSabre was registered in Georgia. However, Officer Lewis testified the window tint drew his attention initially to the Buick, but he stopped the vehicle because of weaving and abrupt changing of lanes almost causing an accident. I find no reason to discredit Officer Lewis' testimony. Defendants make much of the fact that Officer Lewis did not give this explanation to them immediately after the traffic stop when they asked him why he pulled them over. However, as Officer Lewis explained and the video supports, Lewis tried to tell them the full reason why he pulled them over and was cut short by a talkative Alandys Council. While the arrest reports and investigative reports, a total of four reports, mention several reasons for Officer Lewis' attention to the Buick LeSabre, the weaving is mentioned as a reason for the stop in all of them. Furthermore, three of these reports mention the abrupt lane change and near- accident as a reason for the stop. Therefore, I credit Officer Lewis' testimony that he stopped the Buick LeSabre for weaving and making the abrupt lane change in front of another vehicle. Consequently, I conclude Officer Lewis had probable cause to believe the driver had violated Tenn. Code Ann. §

6

Case 1:05-cr-00008-CLC-WBC   Document 45   Filed 05/16/05   Page 6 of 13   PageID #: 6

55-10-205 and Tenn. Code Ann. § 55-8-143(a) when Lewis made the traffic stop.

Tenn. Code Ann. § 55-10-205 provides in relevant part "any person who drives any vehicle in willful or wanton disregard for the safety of persons or property commits reckless driving." Tenn. Code Ann. § 55-8-143(a) provides in relevant part, "[e]very driver who intends to ... turn, or partly turn from a direct line, shall first see that such movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal ... plainly visible to the driver of such other vehicle of the intention to make such movement."

A vehicle stop is reasonable when a law enforcement officer has probable cause to believe he has witnessed a traffic violation, even if the traffic offense is minor and the officer has additional subjective reasons for making the stop. *Whren v. United States*, 517 U.S. 806, 810, 812-13 (1996); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003); *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994), *cert. denied*, 513 U.S. 900 (1994); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994).

The courts have long since abandoned the former rule on so-called "pretextual" stops and now disregard an officer's subjective intentions as long as the stop itself is based on a proper purpose such as probable cause or reasonable suspicion. *See, e.g., Arkansas v. Sullivan*, 532 U.S. 769 (2001) (reversing Arkansas Supreme Court's attempt to consider an officer's subjective motivation for making a valid traffic stop); *Whren v. United States*, 517 U.S. 806, 810, 812-13 (1996) ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."); *United States v. Johnson,* 242 F.3d 707, 709-10 (6th Cir. 2001), *cert. denied*, 534 U.S. 863 (2001) (upholding stop for broken taillight in violation of Tennessee traffic laws regardless

7

of officer's subjective motivation).  Consequently, I conclude the traffic stop of the defendants' vehicle met constitutional muster.

   *B. Defendants' Statements Made in the Back of the Police Car*

    *1. The Fourth Amendment and Title III*

  The defendants assert their statements made in the back of the patrol car immediately after their arrests must be suppressed because these statements were recorded surreptitiously in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1986, 18 U.S.C. § 2510 *et seq*.

  Application of the Fourth Amendment requires a two part analysis aimed at determining whether the individual asserting Fourth Amendment protection had a "justifiable," a "reasonable," or "legitimate" expectation of privacy.  *Smith v. Maryland*, 442 U.S. 735, 741 (1979); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *see also United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000) ("the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized").  The first question in this two part analysis is whether the individual had an actual, subjective expectation of privacy under the circumstances at issue. *Smith v. Maryland*, 442 U.S. at 740 (citing *Katz v. United States*, 389 U.S. 347, 351-61 (1967)); *King*, 227 F.3d at 743.  The second question is whether "the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'–whether...the individual's expectation, viewed objectively, is 'justifiable' under the circumstances."  *Smith v. Maryland*, 442 U.S. at 741 (citing *Katz*, 389 U.S. at 353, 361); *see also*, *King*, 227 F.3d at 742 ("Second, we inquire whether the individual's expectation of privacy is one that society is prepared to

8

Case 1:05-cr-00008-CLC-WBC   Document 45   Filed 05/16/05   Page 8 of 13   PageID #: 8

recognize as reasonable").

Title III of the Omnibus Crime Control and Safe Streets Act of 1986, 18 U.S.C. § 2510 *et seq.* (Title III) prohibits unauthorized interception and disclosure of oral communication. 18 U.S.C. § 2511. Title III defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception, under circumstances justifying such exception, but such term does not include any electronic communication." 8 U.S.C. § 2510(2). The standard for determining whether a violation of Title III has occurred is the same two part standard for applying Fourth Amendment protection. *See Dorris v. Absher*, 179 F.3d 420, 424-25 (6th Cir. 1999) (applying traditional two part Fourth Amendment analysis to Title III claim alleging illegal recording of conversation); *United States v. Clark*, 22 F.3d 799, 801 (8th Cir. 1994) (analyzing Title III and Fourth Amendment claims under same two part standard); *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993) (same).

In the instant case, the defendants were placed in the back of the patrol car after they had been arrested for drug possession. While seated in the back of the patrol car, the defendants spoke freely making various incriminating statements. Given that the defendants so freely and comfortably made statements which would incriminate them, the undersigned concludes the defendants subjectively believed their conversations were private.

Defendants next urge the Court to find that the defendants had an objectively reasonable expectation of privacy in the back of Officer Lewis' patrol car. As defendants have noted, the Sixth Circuit has not ruled on the objective reasonableness of a defendant's expectation of privacy in the back of a patrol car. However, defendants rely on a Tennessee Supreme Court

9

decision as persuasive authority in arguing that they had an objectively reasonable expectation of privacy in the back of the police car. In *State v. Munn*, 56 S.W.2d (Tenn. 2001), the defendant voluntarily came to the police station for questioning about the murder of his college roommate. During questioning, the police asked the defendant if he wished to speak alone with his mother. Upon the defendant's assent, the detective left the room, and the defendant and his mother spoke alone in a room with a closed door. Unknown to defendant, however, their conversation was being monitored, and the defendant confessed to his mother that he had committed the murder. The Tennessee Supreme Court found that, unlike in a prison context, there were no security or safety reasons which justified monitoring the defendant's and his mother's conversation. *Id.* at 496. The court then suppressed the defendant's confession reasoning that the lack of security purposes in monitoring the conversation "when viewed with the circumstances indicating that the officers both deceived and assured the defendant and his parents that they were free to talk in private," gave rise to an expectation of privacy that was "reasonable and justified." *Id.*

Based on the *Munn* decision, the defendants urge the undersigned to adopt a standard whereby an individual would have an objectively reasonable expectation of privacy if police did not have valid security reasons for recording the individual's conversations. Such a standard, presuming a reasonable expectation of privacy exists absent a showing of security reasons to eavesdrop, is not the proper constitutional standard. The proper inquiry is whether "the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable–whether...the individual's expectation, viewed objectively, is justifiable *under the circumstances*." *Smith v. Maryland*, 442 U.S. at 741 (internal citations omitted, emphasis added). "Whether a legitimate expectation of privacy exists in a particular place or item is a

10

determination to be made on a case-by-case basis." *King*, 227 F.3d at 744. In the case of *Munn*, the court found that the lack of security purposes *coupled* with the police's affirmative representation to the defendant that he and his mother were alone gave rise to an objectively reasonable expectation of privacy. Such are not the circumstances in this case as Officer Lewis made no such representation to the defendants. Furthermore, in every case which the undersigned could find where a federal court has been presented with the issue of surreptitiously recording defendants' conversations in a police car, the court has held the defendants possessed no objectively reasonable expectation of privacy. *See e.g., United States v. Turner*, 209 F.3d 1198, 1201 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000); *United States v. Clark*, 22 F.3d 799, 801-02 (8th Cir. 1994); *United States v. McKinnon*, 985 F.2d 525, 528 (11th Cir. 1993); *United States v. Rodriguez*, 1993 WL 241764 *1 (4th Cir. 1993) (per curiam); *United States v. Saenz*, 2000 WL 33725117 *11 (W.D. Tenn. 2000). As the Eight Circuit reasoned in *Clark*, 22 F.3d at 801-02:

> A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions. A police car is not the kind of public place, like a phone booth (*e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), where a person should be able to reasonably expect that his conversation will not be monitored. In other words, allowing police to record statements made by individuals seated inside a patrol car does not intrude upon privacy and freedom to such an extent that it could be regarded as inconsistent with the aims of a free and open society.

In addition, "the practical realities of the situation should be apparent to occupants. Patrol cars bristle with electronics, including microphones to a dispatcher, possible video recording with audio pickup, and other electronic and recording devices." *United States v. Turner,* 209 F.3d at

11

1201. I find these decisions persuasive, adopt the courts' reasoning in *United States v. Clark*, 22 F.3d 799 (8th Cir. 1994) and *United States v. Turner*, 209 F.3d 1198 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000), and conclude the defendants had no objectively reasonable expectation of privacy in Officer Lewis' patrol car.

### *2. The Fifth Amendment*

In his motion to suppress, defendant Council stated twice (on the first page and the last page) that recording his statements in the patrol car violated "the Fourth and Fifth Amendments to the United States Constitution" as well as Title III. (Court File No. 30). These references to the Fifth Amendment are the only such references the undersigned has found in the defendants' motions and briefs. The defendants have not explained to any extent how or why they believe recording their conversation violated the Fifth Amendment nor have they cited any authority on this matter. Therefore, the undersigned concludes the defendants have failed to properly raise a Fifth Amendment issue and will recommend this portion of the defendants' respective motions to suppress be denied. *See* Fed. R. Crim. P. 47 (b) ("A motion must state the grounds on which it is based...").

12

## IV. Conclusion

For the reasons stated herein, the undersigned RECOMMENDS the defendants' respective motions to suppress be DENIED.[2]

                                                       s/William B. Mitchell Carter
                                                       UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).